**UNITED STATES of America,**
**Plaintiff,**

v.

**Alexander Pinero SOTOMAYOR,**
**Defendant.**

**Crim No. 99–139 (DRD).**

United States District Court,
D. Puerto Rico.

Sept. 16, 2002.

Irene C. Feldman, Hato Rey, PR, for plaintiff.

Rachel Brill, Hato Rey, PR, Jayne Weintraub, Miami, FL, for defendant.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Defendant has filed a Supplemental Motion to it's request of acquittal under Fed. R.Crim. P. 29(c). Docket No. 155. Defendant was convicted of intentionally killing a local, drug-enforcement, undercover officer, engaged in the performance of his duties, pursuant to 21 U.S.C. § 848(e)(1)(B).

Defendant alleges in his motion that count one should be vacated because it does not set forth a separate substantive offense. He further contends that, even if the Court finds that count one sets forth a separate substantive crime, the crime must require conviction of the underlying drug offense. Defendant also argues that the inconsistency of the verdict is "obvious"; that he was acquitted of aiding and abetting in the use of a weapon and in a drug transaction, which was the only alleged motivation of the murder. He claims, moreover, that the evidence was insufficient, because the testimony of the informant was that the defendant did not share his criminal intent to commit murder. Moreover, an issue is also separately raised as to whether the testimony of Mr. Osvaldo Cruz-the government's cooperator-is sufficient to support the conviction. The Defendant now invites the Court to revisit the described issues, under Fed. R.Crim. P. 29(c). The Court consider the arguments *seriatim* and ultimately denies the request.

## I

Defendant first argues that, since he was acquitted from two counts which are elements of the count of the conviction, the Court has an obligation to set aside the jury's conviction; parallel to this argument is his allegation that the evidence of conviction is insufficient. Defendant's contention, however, is meritless. The Court explains.

The fact that the jury acquitted the defendant from one charge, which is an element of another charge for which he was convicted, is not decisive. The Supreme Court in *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), found that 21 U.S.C. § 848 created a substantive offense separate from its predicate offenses. Moreover, it explained that courts must discern the "legislative intent" of the statute based in the language, structure, and its legislative history. The Supreme Court reasoned that the legislative history of § 848 establishes that the offenses must be separated. Further, the Supreme Court found that trying defendant for both offenses did not violate the double jeopardy clause. The court reasoned that the importation offense was not the "lesser included offense" of the continuing criminal enterprise violation. Thus, that the jury acquitted the defendant from one charge does not necessarily lead to the dismissal of count one of the indictment.

Defendant further claims that the evidence was insufficient, because the testimony of the informant was that the defendant did not share his criminal intent to commit murder. The standard under Rule 29 is identical in both the trial and appellate courts; courts must discern "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational fact-finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir.1994). This formulation requires that the Court "consider all the evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict." *United States v. Carroll*, 105 F.3d 740 (1st Cir.1997).

The case of *United States v. Hernandez*, 146 F.3d 30 (1st Cir.1998), is instructive, because the First Circuit Court tackled an apparent, inconsistent verdict. In that case the defendant was acquitted by the jury of carjacking and carrying a weapon during and in relation to a crime of violence, but found being guilty of the crime of felon in possession of a weapon. The Court found that the verdict was not *per se* inconsistent because an absolution as to the carjacking could also determine that the fate of the crime of using a weapon in furtherance of a crime of violence. The Court further clarified that "inconsistent verdicts do not required automatic reversals of convictions." *Id.* at 33.

Further, the basis for this rule is clear: "[a]ssuming inconsistent verdicts, there is simple no way of knowing which verdict is correct and which is not." *Id.* at 33 (*citing Dunn v. United States,* 284 U.S. 390, 393–94, 52 S.Ct. 189, 76 L.Ed. 356 (1932). In other words, "[a] Jury may be convinced that a defendant is guilty, yet may acquit him on certain charges based on sympathy or other irrelevant considerations." *Id.*

The critical inquiry regardless of the results in the other counts is to ascertain the following: that "the evidence is legally sufficient to support a guilty verdict on the count of conviction." *Hernandez,* 146 F.3d at 33; *see Powell,* 469 U.S. 57, 62, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Dunn,* 284 U.S. at 390–399, 52 S.Ct. 189. Hence the Court must review the evidence "in the light must amenable to the government" to verify whether or not the evidence is sufficient to convict.

In jury instruction No. 18, unchallenged by both parties, the Court explained that, to establish a violation of 21 U.S.C. 848(e)(1)(B), the government must prove that the defendant: (1) during the commis-sion of/or in furtherance of, and while attempting to avoid apprehension, prosecution, and service of a prison sentence for a felony drug violation, to wit: possession with the intent to distribute and distribution of cocaine, Schedule II narcotic drug controlled substance, as alleged in Count Three of this Indictment; (2) intentionally killed and/or counseled, commanded, induced, procured and/or caused the intentional killing of Shakeer Luvice–Mora; (3) that Shakeer Luvice–Mora was a police of Puerto Rico law enforcement officer; and that he was killed while engaging in and on account of the performance of such officer's duties. The Court further instructed the jury that, in order to find a violation of 21 U.S.C. 848(e)(1)(B), all the elements needed to be founded in the facts.

■ With said instructions in mind, the Court must make a determination as to the sufficiency of the evidence, examining the case as a whole. The government through a cooperator presented evidence that the defendant was the drug supplier; that the cooperator was the intermediator between him and "Chino," (the Puerto Rico undercover police officer-Shakeer Luvice–Mora). Second, evidence was introduced to show that the defendant shared the motivation and the intent with the cooperator to kill the undercover agent. Further, the evidence showed that defendant commanded Mr. Cruz to act, ordering him to kill the "agent," Shakeer Luvice–Mora. Thus, the evidence clearly shows that the government presented sufficient evidence of intention to kill the undercover agent, of both, the defendant and the cooperator. The cooperator testimony shows that the defendant openly gave the cooperator an order because he "brought in" to the drug conspiracy an undercover police agent. The cooperator was given a gun and told what to do.[1]

---

1. Defendant gave him a weapon and told him not to play games, or to "dejate de fantaz-mear," which in the drug world language meant "kill him." See discussion *infra.*

Third, there is no doubt that Shakeer Luvice–Mora was an undercover Puerto Rico police officer, who had infiltrated in the drug-trafficking scheme. At the precise moment of the killing, Mr. Luvice–Mora, the agent, was engaged in the performance of his duties acting as a policeman, impersonating a drug dealer. The agent, Mr. Luvice–Mora, in his performance as drug dealer, had previously purshased cocaine and Mr. Osvaldo Cruz, the cooperator, assisted him in the trafficking scheme. Fourth, at the moment Shakeer was engaged in his official duties as an undercover officer, he was killed by Mr. Cruz (the cooperator), following orders received from the defendant (Alexander Piñero), because "Chino [the undercover Puerto Rico police officer] was an agent and everybody knew that." [2]

The defendant claims that if he was acquitted from the charge of supplying the gun and the drug-trafficking, which are elements of 21 U.S.C. 848(e)(1)(B), he can't be convicted for the intentional killing of the undercover police officer. The Court rejects this argument. The Courts must only verify that the government presented enough evidence to support the conviction, independently of the results of not-guilty as to the other charges. The fact that the jury acquitted or convicted him in the other charges is out of this Court's reach. Defendant may be acquitted from one or more charges, and be convicted of the other(s), pursuant to the holdings of *Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461, and *Dunn*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356.

█ The apparent inconsistencies of the verdict reached by the jury are insufficient to set aside the verdict of conviction reached in this case. Clearly, the jury believed that the government brought suf-ficient evidence to support the conviction. The interest and appearance of justice are fully vindicated as long as the Court assures itself that, regardless of an acquittal in some other case or on some other count, **the evidence is legally sufficient to support a guilty verdict on the count of conviction.** *See Powell*, 469 U.S. at 57, 105 S.Ct. 471; *Dunn*, 284 U.S. at 390, 52 S.Ct. 189; *Hernandez*, 146 F.3d at 32–33; *United States v. Bucuvalas*, 909 F.2d 593, 597 (1st Cir.1990).

## II

The defendant, Alexander Piñero, next alleges that the testimony of the government's cooperator, Mr. Osvaldo Cruz, pointed to a lack of a criminal intent as to Mr. Piñero: to wit, that the defendant did not share his criminal intent to commit murder. Courts generally affirm jury verdicts and judgments, when there is "sufficient evidence" to convict. *See Powell*, 469 U.S. at 57, 105 S.Ct. 471; *Dunn*, 284 U.S. at 390–394, 52 S.Ct. 189. Since Rule 29 requires a reviewing Court to defer credibility determinations to the jury, testimony alone is enough to support conviction. *See United States of America v. Bernal–Rojas*, 933 F.2d 97, 100 (1st Cir.1991). Accordingly, the Court examines Mr. Cruz' (the government's cooperator) testimony:

By MS. MERCADO: [to cooperator Osvaldo Cruz]

Q When you approach[ed] Alex [the defendant], what happened?

A On the 20th of November?

Q Yes, sir, that's correct.

A I asked Alex Piñero if he had gotten the cocaine. And Alex told me that the one who supplied him with the cocaine hadn't delivered it to him yet.

---

2. Transcripts p. 19, Docket No. 159 (Cruz, the cooperator, stated: "when Chino got there to La Marina, several persons were saying that he was an agent, that he had been told that he was an agent").

And that it was Friday, that a good day was going to be lost because we could make a lot of money. And I said okay so I made an approach as to Chino—to Alex.

Q What do you mean by that?

A That I had found some bullets in Chino's car.

. . . .

A I asked myself that would Chino be doing with those bullets.

. . . .

A Well, since I owe money to several persons in the street, drug money. And I've quiet a lot of trouble in the street and I started thinking that may be Chino could be playing a trick on me, like to kill me. **Or in the beginning when Chino got there to La Marina, several persons were saying that he was an agent, that they had been told that he was an agent.**[3] And I started thinking quick until we got to Hobos.

Q Did you tell Alex about your finding of the bullets?

A **I told Alex that I didn't trust Chino, because he was armed and they were saying around La Marina that he was an agent. And then that's when Alex Piñero changed and he told me how can you bring somebody here that you're not clear about.**

Q **What does that mean that you're not clear about?**

. . . .

A That I was going there with a person that I knew pretty well, and I knew who he was.

. . . .

A An I said to him that I wasn't sure that he was an agent because he had been buying drugs around for sometime now.

Q When you say agent, what are you referring to?

A A policeman.

Q Go on.

A But that he was armed, that I didn't know. I didn't have any weapon, so . . . .

Q You told all this to Alex?

A Yes.

Q What else did you tell him?

A **That's when Alex told me that he had a revolver there. He told me he had there and that he would give it to me. And that's when he shouted at Bobby.**

Q **Who is—first of all, let me just ask you, in reference to this picture are the two of you still having this conversation right here where this yellow point is?**

A Yes.

Q **Okay.**

No, sir, you indicated that Alex shouted to Bobby. What did he shout to Bobby?

A **Give that to him.**

Q And when he shouted this to Bobby what had he just said to you?

A **That he had a weapon there, a pistol, that he would give it to me.**

. . . .

Q All right.

Sir, when Alex yelled out to Bobby give him that, what happened then?

. . . .

Q Were exactly was Bobby in reference to the bleachers?

A A little bit to the side of the bleachers.

. . . .

Q So, it will be accurate to say that he was a distance before the bleach-

---

**3.** All highlighting is the Court's.

ers, closer to the road to where Alex was?

A Yes.

Q That is the street where you and Alex where speaking; is that correct?

A Yes.

Q All right.

Now, sir, so when Alex yelled out to Bobby or shouted out to Bobby to give you that, what happened next?

A I went to Bobby, and he and Bobby took it out of there from the side of the road, the grass is quite tall there, and he gave it to me.

Q Excuse me.

What do you mean he took it from the ground?

A From the grass. It was in between the grass. He took it from the grass and gave it to me.

Q Go on.

A **When he gave me the weapon I had my back to where Chino's car was parked. And I went back to Alex—**

. . . .

THE WITNESS [Osvaldo Cruz]: Alex told me not to throw the weapon away, not to lose it.

THE WITNESS: When Bobby gave me the weapon I went back to Alex. And Alex tells me not to lose the weapon, for me to do what I had to do and not be playing like—["dejate de fantazmeo" -in Spanish]

MS. MERCADO: Your Honor, I ask that the record should reflect the phrase in Spanish.

THE COURT: Well, what was the phrase in Spanish?

MS. BRILL: That was not the phrase he said in Spanish. He said—["dejate de fantasmeo"](in Spanish)

THE INTERPRETER: Well, that's what he said.

MS. MERCADO: I'm asking that that be in the record in Spanish, then I will ask him what does that mean, rather than attempt to translate.

MS. BRILL: I don't have any problem with the prosecutor asking her what does it mean, but I would like what he said to be in the record which is "**no fantazmeo**".

THE COURT: "Fantazmeo". Well, "fantazmeo" can be translated. Look it up in the dictionary.

What is wrong with "fantasize". You don't like the word.

THE INTERPRETER: No. I don't think that's what it means at all.

. . . .

MS. MERCADO: Your Honor, what I was stating is that this particular meaning to the action, and in the street they have their own language. And to look it up in the dictionary, specially this word that it can be misinterpreted, the meaning of what he was saying or what it meant in their own world. And so, that is why I asked earlier if the word can be stated or even the whole the phrase.

. . . .

THE COURT: Let's go. What we will do is forget about what he told you he meant give us a literal translation on "fantazmao". What you understand.

THE INTERPRETER: I can't think of anything else other than what I said.

THE COURT: What did you say? I don't know.

MS. BRILL: Don't see ghosts.

THE INTERPRETER: No, not "see", but play.

THE COURT: All right. "Fantazmeo" comes from the word ghost.

So, go ahead. Proceed with your next question.

By MS. MERCADO:

Q  I'd like it to be clear and to ask that you again to state what Alex told you upon you receiving the firearm, the revolver.

A As I walked to him when I reached him, he told me not to lose it and to do what I had to do and not to act like a ghost.

MS. MERCADO: ... and I will ask him then that this meant to him when Alex told him that.

THE COURT:  Fine. **The record will so reflect that he used the word "fantazmeo".  That's the word he used.**

by MS: MERCADO:

Q  **Now, sir, what did that mean to you?**

A **For me not to talk too much and to do what I had to do, kill him.**

Q  And is this language that you and Alex had used before, not this particular word about no "fantazmeo"?

. . . .

(JURY  WITHDREW  FROM  THE COURT ROOM)

THE COURT: I'm going to precautionary hear the answer away from the jury at this time, and make sure that I don't have a 403 or a 404.

. . . .

MS. MERCADO:

Q  Sir, why did you understand that Alex was telling you to stop talking and to kill him, when he used the words about "no fantazmeo"?

A Well, he was giving me a revolver and we're talking about a person that they were saying that he was an agent.  And we didn't know what was going on with the person.

. . . .

A And that person could harm him.

**So, he had given me the revolver so that I would go question Chino, and if I had to kill him to kill him.  And he was saying those words do not "fantazme", you deal with that.  He**

**was telling me to do it and not to talk too much.**

. . . .

THE COURT:  The Court will permit the question if it is rephrased to the point where it is:  What did you understand he meant?  Not what he meant, what did you understand he meant?

MS. MERCADO:  Yes, Your Honor, and I believe that was the question.

. . . .

THE COURT:  **What did you understand he meant by fantasizing or whatever.**

MS. MERCADO:  We're beyond that question, in that I asked him what did you understand he meant by that and he said to stop talking and kill him.

MS. BRILL:  **The jury heard that question and heard the answer: can't talk too much, don't talk much, do what you have to do.  That was the answer.**

. . . .

THE COURT:  Okay. The Court will not stop those questions from arriving to the jury.  That's the determination of the Court.

MR. BRILL:  Our objection is noted.

THE COURT:  Okay.

(JURY  CAME  IN  TO  THE  COURT ROOM)

. . . .

By MS. MERCADO:

Q  In reference to the statement that you previously made, **why did you understand that Alex meant for you to stop talking and to kill him.**

A ...  **He's giving me a firearm and I'm talking to him saying to him that Shakeer is an agent.  That's why I understood he was giving it to me so that I would kill Shakeer.**

Q And this phrase that you used "dejar de fantazmear" is that—

MS. BRILL: Objection, Your Honor. It's not a phrase. She keeps saying it differently than the way he says it.

THE COURT: Well, please use—**please tell us what is the phrase that you have used with the word "fantazmear".**

THE WITNESS: **Deal with that and stop "fantazmear".**

THE COURT: "Deja de fantazmear". Stop "fantazmear" or stop whatever.

MS. BRILL: Your honor, I would request that at one point on the record that we have the word "dejate de fantazmeo". Those are the words. In Spanish.

THE COURT: **"Dejate de fantazmeo".**

. . . .

By MS. MERCADO:

Q Sir, you indicated that you're a drug dealer, drug user and you also had and used a firearm, correct?

A Yes.

Q And in the world that you live in of drug dealing, drug pushing, is the term "dejate de fantazmeo"—

. . . .

By MS. MERCADO:

Q **"Dejate de fantazmeo" is that a term that is commonly used?**

A **It's used a lot.**

**For example, when a person makes you an approach, and he tells you that he has a problem with another person. And he tell you so has—I'm tired of so and so because he keeps on doing this. You say "no fantazme nada mas". Hit him. It's used in the street.**

Q **What did you mean by the words hit him?**

A **Fight him. Fight him. Get rid of the problem. Don't talk too much. The word "fantazmear" is always used with a person that talks a lot and doesn't get to it.**

Q **So, why on this occasion did you understand that Alex was telling you to kill Chino, if in the past it had meant to hit someone?**

A **Well, because he was giving me a weapon and with a weapon I wasn't going to hit him, and a weapon is used to kill, to fire. It's not to hit anyone.**

*See* Trial Transcript, Docket No. 159, pp. 17–32 (emphasis added).

■ As stated above, the jury found that Defendant was guilty of the intent to kill and/or counsel, command, induce, procure, and/or cause the intentional killing of Shakeer Luvice–Mora, a Police of Puerto Rico, law-enforcement officer, engaged in his official duties. The Court finds that the jury reached this conclusion because it clearly understood that the evidence presented in the case, at trial, was sufficient to support a conviction.

Mr. Cruz' testimony and the other evidence presented by the prosecutors was for the jury, in itself, enough to render the conviction for the offense charged. The jury properly considered the evidence and the law pertaining to aider and abettor liability. In *United States v. Campa,* 679 F.2d 1006, 1010 (1st Cir.1982), the court held that the essential element of this liability is that the aider and abettor shared in the principal's criminal intent, which may be proven circumstantially. The testimony shows that the defendant did share the cooperator's criminal intent of killing an agent engaged in official duties. The defendant Piñero was an aider and abbetor because he provided the weapon and told the killer "dejate de fantazmear," which, in the Puerto Rican drug world, meant "hit him," meaning "kill him." Therefore, the defendant's argument as to lack of criminal intent to kill must fail.

## III

**WHEREFORE,** in light of the reasons stated above, the Court the defendant's motion for acquittal under Rule 29(c), is hereby **DENIED.** Docket No 155.